UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
JESSICA L. WAHL,

                                      :            Case No. 15-cv-06522 (RJS)

                Plaintiff,

                                        :            **AMENDED COMPLAINT**

          -against-

                                        :

STERLING & STERLING INC., DAVID
STERLING AND LESLIE NYLUND,
                                        :

               Defendants.      :

-----------------------------------------------------------------X

Plaintiff, by and through her attorneys, Warshaw Burstein, LLP, as her amended complaint against Defendants, alleges as follows:

## PARTIES

1.        Plaintiff, Jessica L. Wahl (hereinafter, "Jessica Wahl") is an individual, and at all times herein mentioned was a resident of New York, New York and later, Woodbury, New York.

2.        In April 2015, Jessica Wahl became a resident of Florida.

3.        Upon information and belief, at all times relevant, defendant Sterling & Sterling Inc. (hereinafter, "SSI"), was an insurance broker and risk management corporation incorporated in the State of New York. Upon information and belief, David Sterling and Leslie Nylund, are residents of the State of New York (together with SSI, hereinafter referred to as "Defendants").

4.        In May 2011 Jessica Wahl was hired by SSI as its Senior Vice President, Manager of the Claim Department and Essential Services and Programs, and Third-Party

Administrator.  Within weeks of her employment, Jessica Wahl was promoted to Risk Management Services Practice Leader and supervised approximately seventeen employees.

5.      SSI was at all relevant times a covered employer for the purpose of all statutes relied on in this amended complaint that prohibit discrimination and retaliation.

## JURISDICTION AND VENUE

6.      This action arises under 42 U.S.C. § 2000e-2(a)(1) and 29 U.S.C. § 633 et seq. Jessica Wahl seeks damages because Defendants intentionally and unlawfully harassed, discriminated and retaliated against her in her employment causing her economic damages, severe emotional and physical distress and other damages.

7.      Jurisdiction of this Court is proper pursuant to 28 U.S. Code § 1332, founded upon an amount in controversy that exceeds $75,000 and diversity of citizenship. Jessica Wahl is a citizen of Florida, and SSI's principal place of business is in New York State and on information and belief the individual defendants are residents of New York State.

8.      Jurisdiction of this Court is also proper pursuant to Title 28 U.S.C. §§ 1331, 1343, 1367, and 2201. Jurisdiction is founded upon the deprivation by Defendants of Plaintiff's Federal Civil Rights, and upon supplemental state law claims which are so related to the federal civil rights violations and deprivations that they form part of the same case or controversy under Article III of the United States Constitution.

9.      On March 2, 2015 Jessica Wahl filed a charge of sex and age discrimination with the Equal Employment Opportunity Commission ("EEOC"), in accordance with 42 U.S.C. § 2000e-2(a)(1) and 29 U.S.C. § 621 et seq, attached as Exhibit A.  On May 15, 2015, the EEOC mailed to Jessica Wahl a right to sue letter, attached as Exhibit B.

10.      Venue is proper in this district under 28 U.S.C. § 1391(b)(1) because

Defendant SSI has offices located in New York County at 441 Lexington Avenue, New York, New York, 10017, and, therefore, resides in this district within the meaning of the applicable statutory provision.

## DEMAND FOR A JURY TRIAL

11.     Jessica Wahl hereby demands a jury trial as provided by Rule 38(a) of the Federal Rules of Civil Procedure.

## FACTUAL ALLEGATIONS

12.     SSI, through its owner, David Sterling (hereinafter, "Sterling"), and its male revenue producers who are responsible for producing clients on SSI's and Sterling's behalf (hereinafter, the "Producers") -- acting at SSI and Sterling's direction, knowledge, consent, encouragement and/or condonation – created a workplace so pervaded with discriminatory intimidation and hostility that it altered the conditions of Jessica Wahl's work environment.

13.     This pervasive and unremitting hostility by SSI and Sterling was directed at Jessica Wahl and other female employees, specifically due to their status as women.

14.     This hostility occurred with such severity and unrelenting frequency that Jessica Wahl suffered severe distress which manifested itself in the form of both emotional and physical injuries.

15.     The hostility directed at Jessica Wahl came not only in the form of slurs, insults, jokes and demeaning comments about women and/or single mothers, but also, unwanted physical contact and sexual advances.

16.     During the relevant time period, Jessica Wahl reported directly to Leslie Nylund (hereinafter, "Nylund"), a woman who was Vice-Chair of SSI, and upon information and belief had become President in late 2012.

17.     Shortly after the beginning of Jessica Wahl's employment, female members of Jessica Wahl's staff told her that they had considered quitting because they felt powerless against the pervasive hostility from the Producers.

*Producer – Jonathan Friedman*

18.     Jonathan Friedman (hereinafter, "Friedman") is a Producer and the stepson of Sterling.

19.     Friedman is a young male Producer and being the stepson of the owner, Defendant Sterling has shielded him from reprimand and discipline for yelling at Jessica Wahl, demeaning and berating her, violating SSI's own policies, and, shockingly, even threatening to kill her.

20.     In the summer of 2011, Friedman often asked hypothetical insurance coverage questions of Jessica Wahl, for which he wanted her to provide written responses so that he could send them to clients.

21.     Jessica Wahl respectfully declined to do so advising him that such written responses would violate and jeopardize Defendant's Errors and Omissions.

22.     Friedman's interactions with Jessica Wahl then became very hostile.

23.     During the same time period, Jessica Wahl worked closely with Carol DeSantie (hereinafter, "DeSantie"), then SSI's Human Resources Manager, to write new job titles and job descriptions for the Risk Management Services Department.

24.     To Jessica Wahl's surprise, Nylund summoned DeSantie and Jessica Wahl into her office to warn them that Friedman was concerned that the two women spent so much time together. Nylund told DeSantie and Jessica Wahl, "Friedman knows that you are single mothers… [you] need to be more careful around him." Nylund's focus on this issue was

somewhat strange. Jessica Wahl interpreted Nylund's warning as evidence of how powerful Producers, such as Friedman were in any situation in which their interests conflicted with those of female employees, always concluding with the Producers being victorious. On information and belief, Nylund did not address any single father as to needing to be careful and was engaging in a skewed form of disparate treatment. This advice as to protecting two females from a hostile work environment was a grossly inadequate response which failed to eliminate that very hostile environment.

25.     In October 2011, Friedman became irate with Brenda Cohen (hereinafter, "Cohen"), a manager on Jessica Wahl's team, berating her for not completing a claim report for his client.

26.     Jessica Wahl explained to Friedman that Cohen had largely completed a claim report for the client, with the exception of "legacy files" from the client's previous insurance carrier, which generally and unavoidably take longer to obtain and often require a client's involvement.

27.     In response, Friedman raised his voice and yelled at Jessica Wahl, "You have an excuse for everything!" and, in a surly fashion, took the existing claims report, which did not yet reflect the legacy files.

28.     Shortly thereafter, on October 27, 2011, Nylund told Jessica Wahl, "Be careful with [Friedman]. He is an idiot but he is dangerous. Document everything that happens with him."

29.     On October 31, 2011, Nylund told Jessica Wahl that Friedman threatened to kill Jessica Wahl. Nylund stated, "On Friday, [Friedman] was so upset that he threatened to

kill you.... You should have seen him on Friday, making grunting noises, stomping around and telling me he wants to kill you."

30.     Naturally upset and in fear for her life, Jessica Wahl was in tears when she drove home that night.  On that evening, and at subsequent times during her employment, Jessica Wahl was anxious, depressed, and suffered sleep deprivation and other stress as a result of Friedman's behavior, resulting in exacerbation of previously dormant medical complications.

31.     Upon hearing about Friedman's threat, Jessica Wahl sought help from DeSantie, but despite being in charge of Human Resources, DeSantie told Jessica Wahl that there was nothing she could do about the threat.

32.     Rather than take any action, DeSantie told Jessica Wahl to  (1) keep a written timeline of Friedman's actions;  (2) keep a journal as a way for Jessica Wahl to cope with her frustrations; (3) not be alone in a room with him; if Friedman entered Jessica Wahl's office, she wanted Jessica Wahl to pretend to be busy and tell him to return later; and (4) tell Doug Monty, a member of Jessica Wahl's team about Friedman's threats because, as DeSantie said, "Doug is a big guy, so I doubt that Friedman will pull anything around him."  It's to be noted that DeSantie's recommendations centered on a mental health recommendation to help Jessica Wahl cope with the hostile work environment and to avoid confrontation with Friedman but totally ignored preventing the hostility which pervaded the office, taking the position that she was powerless to cure the problem.

33.     DeSantie's recommendations to Jessica Wahl embodied and perpetuated the offensive and outdated stereotypes about gender roles that totally pervaded the Defendants' workplace: A woman in Jessica Wahl's shoes should not need a "big guy" to protect her from a

coworker's threats of physical violence. Of course, Title VII of the Civil Rights Act of 1964 requires Defendant SSI to provide a non-hostile work environment for its employees.

34.     DeSantie's lack of action to stop or even mitigate the hostility to which Jessica Wahl was subjected, again confirmed Defendants' acquiescence, their condonation of the discriminatory acts of its Producers towards women and emboldened the culprits to continue unremittingly in their hostile, illegal practices.

*Producer - Robert Trinagel*

35.     Another Producer who contributed to the hostile work environment was Robert Trinagel (hereinafter, "Trinagel") who often greeted Jessica Wahl with unwelcomed embraces, strong hugs, kisses to Jessica Wahl's face, and other unwanted forms of touching on Jessica Wahl's body, including running his hands over Jessica Wahl's shoulders and caressing Jessica Wahl's back during numerous attempts to massage her.

36.     Jessica Wahl would often flinch and physically evade Trinagel's attempts to touch her body.

37.     On many such occasions, Jessica Wahl orally requested to Trinagel to stop touching her.

38.     On one occasion, Jessica Wahl asked Trinagel why he insisted on touching her constantly. He responded, "I just love you and I'm so glad you are here."

39.     After asking Trinagel on numerous occasions to stop touching her, Trinagel's interactions with Jessica Wahl became increasingly hostile.

40.     Per her role within SSI, Jessica Wahl had the exclusive authority to negotiate fees charged by the Third Party Administrator when it serviced clients.

41.     Jessica Wahl's performance appraisal and compensation were dependent on her department's profitability because they were components of her performance evaluation.

42.     On June 29, 2011, Jessica Wahl and Trinagel agreed on a price to charge a client serviced not only by the insurance brokerage but also the Third Party Administrator.

43.     Shortly thereafter, Trinagel undercut Jessica Wahl's quotation by $10,000 without her permission.

44.     Upon information and belief, Trinagel did so in response to Jessica Wahl's objections to his physical advances.

45.     Although Jessica Wahl reported Trinagel's behavior to Nylund who had management authority over Trinagel, upon information and belief, Trinagel sustained no repercussions for violating SSI's policies, undercutting Jessica Wahl's department and diminishing its revenue.

46.     Contrary to SSI's own company policies, insurance regulations, Jessica Wahl's objections, as well as Nylund's orders, Trinagel improperly involved himself in the claim adjusting/settlement process for the SSI's clients.

47.     Trinagel's involvement in adjusting claims was problematic for several reasons, including (1) he was not licensed to adjust claims in New York or on information and belief, any other state, thus violating N.Y. Ins. Law § 2102(a)(1), (2) adjusting claims without a license is contrary to the SSI's office rules, and (3) any mistakes/errors made in adjusting claims could cause an exposure/claim against SSI's Errors & Omission insurance policy.

48.     Upon information and belief, Trinagel sustained no adverse consequences for this direct insubordination of Nylund, a female executive of the company, nor his violation of SSI's company policies, and insurance law.

49.     Rather, to protect Trinagel, on information and belief, SSI repeatedly submitted false attestations with respect to its internal operations, knowing full well that it was not compliant with industry audit and control standards. Such false attestations were submitted to insurance carriers regulated by New York and other states' insurance regulators, as well as auditors from insurance companies and New York State,

*Cruise Ship Outing*

50.     In March 2012, Jessica Wahl was one of the employees invited on a company cruise, supposedly to reward those who performed well throughout the year.

51.     Trinagel and his wife were aboard this cruise.

52.     Jessica Wahl was aboard this cruise.

53.     While Trinagel did not attempt to embrace, kiss, massage or inappropriately touch Jessica Wahl in front of his wife, on several occasions, Trinagel greeted Jessica Wahl by punching her arm and laughing.

54.     Jessica Wahl begged Trinagel not to punch her in the arm after each such occasion.

55.     At one point, Jessica Wahl was dining with then-General Counsel of the Company, David Paige, Esq., when Trinagel and his wife sat down to dine with them. Trinagel was about to punch Jessica Wahl in the arm when she sternly, but politely, said "keep your hands off me" and "stop hitting me."

56.     In April 2012, after the company cruise, Jessica Wahl met with DeSantie to report Trinagel's past and ongoing physical abuse and inappropriate behavior, including the behavior Jessica Wahl previously reported to Nylund.

57.     DeSantie never followed up with Jessica Wahl after their meeting.

58.     DeSantie did not indicate that she would have any discussion with Trinagel - not about his unwanted touching, nor anything else.

59.     Upon information and belief, DeSantie did nothing in response to learning about Trinagel's unwanted touching and other inappropriate behavior.

60.     Indeed, upon information and belief, Human Resources failed to take any corrective action to stop or mitigate this abusive and discriminatory behavior.

61.     Rather, and to Jessica Wahl's astonishment, in May 2012, Nylund and DeSantie told Jessica Wahl to make herself "more available" to Trinagel after he complained that Jessica Wahl often evaded him.

*Retaliation and Complaints from Jessica Wahl's Female Co-Workers*

62.     Upon information and belief, Trinagel and Defendant SSI were sued for sexual harassment by another female employee.

63.     In May 2012, Trinagel taunted Jessica Wahl that he was still employed by SSI even though another female employee sued SSI and Trinagel personally for his behavior, proudly proclaiming, "Guess what Jessica [addressing Jessica Wahl], I'm still here."

64.     When Jessica Wahl reported these taunts to Nylund, her sole remedy was in the form of instructions to Jessica Wahl to "ignore him." Upon information and belief, no action was taken by any Defendant to discipline or even restrain Trinagel's unlawful behavior.

65.     A few days later, in May 2012, Jessica Wahl reported Trinagel's misconduct, Nylund moved Jessica Wahl into a smaller office in an act of retaliation for Jessica Wahl's complaints of gender discrimination and hostile work environment.

*Producer – Thomas Clementi*

66.     Thomas Clementi (hereinafter, "Clementi") was another of SSI's Producers whose behavior which pervaded the workplace.

67.     Shortly after Jessica Wahl started her employment with SSI, Clementi told Jessica Wahl that there were way too many women in leadership in the company and that Jessica Wahl, herself was only hired because a woman, Nylund, was in charge.

68.     Clementi demeaned Jessica Wahl on a regular basis. He often banged on Jessica Wahl's office glass window and/or shouted at Jessica Wahl to get her attention.

69.     Female claim consultants often reported to Jessica Wahl that they felt demeaned, dejected and powerless due to Clementi's hostile outbursts.

70.     Jessica Wahl reported this feedback to Human Resources, as well as details of Clementi's outbursts which she experienced firsthand and, upon information and belief, Human Resources took no action in response.

71.     On November 1, 2012, in the aftermath of Hurricane Sandy, Clementi confronted Jessica Wahl in front of her claim consulting staff to demand details from her about a non-storm related claim involving his client.

72.     In response to the request, Jessica Wahl asked Clementi if the inquiry could wait due to the overwhelming struggles her staff faced to get Hurricane Sandy-related claims reported.   Clementi then started yelling at Jessica Wahl, berating her for being asked to wait.

73.     While Jessica Wahl politely asked Clementi to stop yelling at her, Clementi continued his diatribe, compelling Jessica Wahl to seek immediate assistance from

Donna Raab (hereinafter, "Raab") who, upon information and belief had become the Human Resources Director in or about July 2012.

74.     In Raab's office, Jessica Wahl remained calm and professional while Clementi continued his hostile yelling.

75.     Clementi was so angry in front of Raab and Jessica Wahl that he was shaking physically. He screamed in Jessica Wahl's face: "I have been here for more than twenty-five years and I am not changing now. If you do not like it - tough." He then stood up, opened Raab's door and left. Jessica Wahl remained seated in Raab's office, overwhelmed with shock.

76.     Jessica Wahl emailed Nylund from Raab's office to advise her of the confrontation by Clementi. Nylund confirmed that Sterling was aware that they were in Raab's office. Nylund instructed Jessica Wahl to return to her own office because complaining about Clementi's attack was a waste of time.

77.     Moments later, Sterling called Raab's office to see if Jessica Wahl was okay. Jessica Wahl told Sterling that she was very distressed and upset by Clementi's behavior. While Sterling then promised that he would speak to Clementi about his outrageous behavior, neither Sterling nor Human Resources ever followed-up with Jessica Wahl about the incident. Rather, thereafter, Sterling and Human Resources simply acted as if the incident had never happened.

78.     Upon information and belief, Clementi sustained no repercussions for his extreme hostility.

79.     Upon information and belief, other instances of Clementi's outrageous hostility had caused other female employees to end their employment with Defendant, including Carole Newman, Angela DeChiarra, Elvira Greydon, Kathy Natale, and Linda Claire.

*Leslie Nylund*

80.     During Jessica Wahl's performance appraisal discussion with Nylund in late summer 2012, Nylund commented that Jessica Wahl seemed to be very friendly with the Producers. At this time, Jessica Wahl respectfully clarified that she was merely trying to survive without getting yelled at, hit or otherwise abused.

81.     In October 2012, when Jessica Wahl received the final version of her performance appraisal, Nylund again commented to Jessica Wahl that she seemed to be getting along with Producers. Jessica Wahl, however, again clarified that she was, in fact, afraid of the Producers.

82.     In response, Nylund admitted that Sterling does not do anything to mitigate the Producers' hostility. Nylund further explained that the Producers think that they can be insubordinate to Nylund because she is a woman. Moreover, Nylund told Jessica Wahl that the Producers run to Sterling for protection if they do not like Nylund's instructions because they know Sterling will protect them.

83.     Nylund's advice to Jessica Wahl was to be hostile in response to the Producers' hostility. Jessica Wahl, however, genuinely feared escalating the situation to a potentially violent level.

84.     Also in 2012, Jessica Wahl agreed, reluctantly, to allocate Friedman $10,000 of a $60,000 fee paid by a client to Jessica Wahl's department. Although Jessica Wahl's performance was evaluated in part based on her department's profitability, Jessica Wahl

allocated these funds to Friedman to avoid further problems with the man who – as Jessica Wahl had been told by the President, Nylund – had threatened to kill her.

85.     In 2013, Friedman lost the brokerage business for this particular client. At the same time, however, the client wanted to continue to work with Jessica Wahl's department. That client renewed its contract with her department, exclusively, in 2013.

86.     In 2013, Friedman asked to be paid $10,000 again, although he no longer had the brokerage business.  Nylund recommended that Jessica Wahl again forfeit $10,000 of her department's income from the client to Friedman a second time.  When Jessica Wahl refused, Nylund, despite having told Jessica Wahl previously that Friedman was dangerous and to be careful around him, forced Jessica Wahl to meet with Friedman to explain why he was not entitled to the funds.

87.     When Friedman was told that he was not going to get $10,000 from the client in 2013, he became enraged and started to make loud, menacing huffing and puffing noises toward Jessica Wahl, causing Jessica Wahl again to fear for her life.

88.     Upon information and belief, Friedman was promoted in early 2014 to an Executive Management position, leading the entire sales/production staff.

*Disparate Impact and Further Hostility*

89.     On July 3, 2012, Gina Gerbino (hereinafter, "Gerbino"), a member of Jessica Wahl's Department, told Jessica Wahl that she wanted to file a formal complaint against Robert LaRocca (hereinafter, "LaRocca"), because of his "constant derogatory and nasty comments" about her work.

90.     Gerbino stated that LaRocca, picked on her because she was a woman.

91.     Gerbino stated that she was hesitant to approach Human Resources because she believed Human Resources would not do anything to stop LaRocca's hostility.

92.     Jessica Wahl took Gerbino's concerns seriously and met with Nylund first, and then both with Sterling and Nylund on July 5, 2012 to report Gerbino's complaints.

93.     At the meeting, Sterling assured Jessica Wahl that he would instruct LaRocca to "tone down" his approach. However, at the end of this meeting, Sterling mockingly, sarcastically, asked Jessica Wahl, "Do you feel better now?"

94.     Upon information and belief, Sterling's attempts to assuage Jessica Wahl were insincere and no action was taken to address the Gerbino's and Jessica Wahl's concerns about the hostile work environment.

95.     In early 2013, Jessica Wahl and her staff met with Nylund and Raab. Compensation was among the topics discussed. Many female employees, including Gerbino, expressed their hope for a salary adjustment; they had worked for years with little or no salary increase.

96.     In March 2013, Gerbino resigned, citing abuse from Producers along with a refusal by Defendants to give her the raise as the reasons for her resignation.

97.     Defendants hired a male employee to replace Gerbino. His salary exceeded Gerbino's by more than $30,0000. His compensation included a guaranteed annual bonus of $10,000. In comparison, Gerbino's annual bonus was in the $3,000 to $5,000 range.

98.     This new male employee was also allowed to work from home. Defendants also provided him with a hotel room for times when he had to visit the office and even reimbursed him for his meal and car expenses.

99.     Rose Schneider, a member of Jessica Wahl's staff expressed to Jessica Wahl frustration that the "courtesies" granted to the new male employee differed from those granted to female employees; this was a case of gender bias.

100.    In Spring 2013, Sterling told Jessica Wahl and Nylund that one of staff members in Jessica Wahl's department, Doug Monty (hereinafter, "Monty"), was not giving clients the feeling that he really cares about them because he "does not cry with the clients" like the female consultants do.

101.    Jessica Wahl attempted to discuss Monty's particular coverage issue with Sterling when he shouted, "Jessica, are you on fucking Pluto? Don't you get it that the problem is with [Monty's] communication style?"

102.    Jessica Wahl was in shock that Sterling yelled at her with such hostility. That evening she was nauseous, suffered from a panic attack, and then cried herself to sleep.

103.    Although Jessica Wahl felt sick, she returned to work the next business day, determined to do her job. Nevertheless, her illness persisted each day. Every day, at 8:30 a.m., before leaving her home for the short drive to work, Jessica Wahl endured nausea and diarrhea. She was unable to eat or drink without getting sick. In the evenings, she came home in tears and continued to suffer from insomnia.

104.    The extreme hostility of her work environment caused Jessica Wahl's blood pressure to rise dangerously throughout the course of her employment.

105.    Jessica Wahl continued working because she convinced herself that she had become accustomed to the abuse. Dealing with this hostility had become an unspoken term of her continued employment.

106.    Knowing that this was unhealthy, Jessica Wahl sought treatment from a behavioral therapist during this time.

107.    Because of the intensification of her health problems, Jessica Wahl's doctor advised her that she could not travel out of the area in case she required medical treatment.

108.    During this period of time, Jessica Wahl was invited on an Executive Retreat due to her stellar job performance despite all of the obstacles she faced.  Jessica Wahl provided a doctor's note to Human Resources to excuse her from the Executive Retreat.

109.    On May 10, 2013, Jessica Wahl reiterated to Nylund that she felt abused, that her health was being compromised, and that Defendants did not provide her with a safe place to work.

110.    Later that week, Nylund admitted to Jessica Wahl that Sterling is a very difficult person to work with and acts like "the King in this Castle."

111.    On April 1, 2014, Nylund met with Jessica Wahl to review her recommendations for bonus amounts to be paid to members of Jessica Wahl's department.

112.    During this meeting, Nylund discriminated against staff member, Voula Christy (hereinafter "Christy"), on the basis of her marital status and alleged sexual relationship with a former employee.

113.    Upon information and belief, Christy was recently divorced and had three children.

114.    Upon information and belief, Nylund was under the impression that Christy was engaged in a sexual relationship with former employee, Steve Sanchez.

115.     At this juncture, Nylund asked Jessica Wahl, did you know "[Christy] is fucking Steve Sanchez? Cut her bonus in half."

116.     At the time, Jessica Wahl did not know of the supposed personal situation; nor did she care about it if it were true. Jessica Wahl outlined a business case for the higher bonus she recommended for Christy and tried to focus on Christy's excellent work performance. Nevertheless, Nylund forced Jessica Wahl to reduce Christy's bonus amount.

117.     At Jessica Wahl's performance appraisal on April 17, 2014, Jessica Wahl was advised that her bonus payment would be lower than the prior year. Upon information and belief, Defendants lowered Jessica Wahl's bonus as a retaliatory act for Jessica Wahl's objections to Defendants' hostility towards woman.

118.     Defendants' discrimination against Jessica Wahl was also reflected in Jessica Wahl's compensation and work hours. Jessica Wahl's base pay of $175,000 per annum was not adjusted throughout the course of her employment with SSI.

119.     On April 17, 2014 at the same performance appraisal at which Jessica Wahl was informed of her lowered bonus, Nylund told Jessica Wahl that she was being placed on warning about losing her position. Nylund's stated reason for doing so was that Jessica Wahl had emailed correspondence between Nylund and Jessica Wahl to a subordinate of Jessica Wahl's. Upon information and belief, however, such stated reason was merely a pretext, a transparent "paper trail" being created to retaliate against Jessica Wahl for reporting the myriad instances of hostile work environment and discrimination.

120.     When Jessica Wahl asked for tangible examples of what she needed to improve, Nylund merely said, "it's the whole package."

121.    At this meeting, Jessica Wahl's stomach pain became intense, causing incontinence.

122.    After Jessica Wahl's performance appraisal, she returned to her office and suffered a panic attack.  The entire situation -- having been subjected to such bad treatment for almost three years only then to be told that she was insubordinate -- was too much for her to bear.

123.    Jessica Wahl immediately went to the doctor after her panic attack.  He advised Jessica Wahl against returning to work for her current employer due to the medical problems which had developed.

124.    Nevertheless, in spite of her doctor's instructions, and in the hope that a few days of vacation had allayed her medical conditions, Jessica Wahl returned to the office on April 28, 2014.  But, it soon became apparent that returning to work was indeed a mistake; she suffered another panic attack, had difficulty breathing, suffered extreme stomach pains and endured relentless anxiety throughout the day.

125.    That night, Jessica Wahl's symptoms continued as she lay in bed and cried for hours.  She called her doctor and psychotherapist late that evening for help.  Both made appointments to see her the next day.

126.    On April 29, 2014, when Jessica Wahl saw her doctor, he determined that to return to work was detrimental to Jessica Wahl's health because of her extremely high blood pressure and other conditions.  He wrote a letter to Raab in Human Resources indicating that Jessica Wahl was unable to return to work.

127.    Jessica Wahl's health has been so severely damaged by Defendants' illegal maltreatment of her that it will be a very long time before she can return to the workforce, if ever.

128.    Jessica Wahl sought to obtain short term disability benefits from Defendant SSI in May and June of 2014, to which she was entitled as a result of her medical condition.

129.    Upon information and belief, SSI's short term disability carrier sent Jessica Wahl's short term disability checks to defendant SSI.

130.    To the present day, SSI has never forwarded that short term disability checks to Jessica Wahl.

131.    SSI's failure to forward the short term disability checks to Jessica Wahl, was in retaliation for her complaining to Defendants about their unlawful discrimination.

132.    Additionally, in the Spring and early Summer of 2014, Jessica Wahl applied to SSI for FMLA benefits to which she believed she was entitled as a result of her medical condition.

133.    SSI was dilatory in providing FMLA leave benefits to Jessica Wahl in retaliation for her complaining to Defendants about their unlawful discrimination.

134.    Throughout the period of time in which Jessica Wahl was attempting to obtain the short term disability benefits and the FMLA benefits, SSI was well aware of the fact that Jessica Wahl was in a fragile state of health as a result of the enormous pressure caused by Defendants' harassment.

135.    SSI's retaliation caused Jessica Wahl to have emotional distress and mental anguish.

## FIRST CLAIM FOR RELIEF – AGAINST DEFENDANT SSI

### Violation of Title VII of the Civil Rights Act of 1964 – Sexual Discrimination

136.   Jessica Wahl repeats and realleges the allegations contained in paragraphs 1 through 135 above, as though repeated and set forth in full herein.

137.   Pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a)(1), it is an unlawful employment practice for an employer: (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to such individual's compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect such individual's status as an employee, because of such individual's race, color, religion, sex, or national origin. Jessica Wahl was at all times herein an employee covered by 42 U.S.C. 2000e, et seq., prohibiting discrimination in employment on the basis of sex.

138.   By reason of SSI's conduct as alleged above (including the conduct of the Producers, acting at SSI's direction and/or with SSI's knowledge, consent, and/or condonation), SSI engaged in an unlawful employment practice by discriminating against Jessica Wahl with respect to her compensation, terms, conditions, or privileges of employment because of her sex.

139.   As a proximate result of SSI's hostile work environment and discrimination against Jessica Wahl, as alleged above, Jessica Wahl was constructively discharged by SSI on account of her sex, has suffered and continues to suffer substantial

economic losses and has suffered and continues to suffer embarrassment, emotional distress, humiliation, and mental anguish, all to her damage in an amount to be proved at trial.

## SECOND CLAIM FOR RELIEF – AGAINST DEFENDANT SSI

### Violation of Title VII of the Civil Rights Act of 1964 – Retaliation

140.     Jessica Wahl repeats and realleges the allegations contained in paragraphs 1 through 139 above, as though repeated and set forth in full herein.

141.     Pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-3(a), it is an unlawful employment practice for an employer to retaliate against an employee who opposes unlawful discriminatory conduct, or asserts civil rights protected by this statute. Jessica Wahl was at all times herein an employee covered by 42 U.S.C. § 2000e, et seq., prohibiting discrimination in employment on the basis of sex.  Defendant SSI was at all times herein an employer subject to 42 U.S.C. § 2000e, et seq.

142.     By reason of SSI's conduct as alleged above (including the conduct of the Producers, acting at SSI's direction and/or with SSI's knowledge, consent, and/or condonation), SSI engaged in an unlawful employment practice by retaliating against an employee (Jessica Wahl) who opposed discriminatory conduct and asserted civil rights protected by Title VII.

143.     Attorney's fees are recoverable in an action for which they are specifically provided by statute. Title 42 U.S.C. §§ 1988 and 2000e-5(k) provide that reasonable attorney's fees and costs are recoverable herein by the prevailing party.  As a result, Jessica Wahl is entitled to reasonable attorney's fees and costs.

144.     SSI's conduct was despicable and the acts herein alleged were malicious and oppressive, and were committed with an improper and evil motive to injure Jessica Wahl,

amounting to malice and in conscious disregard of Jessica Wahl's rights. Jessica Wahl is thus entitled to recover punitive damages from Defendant SSI in an amount to be proved at trial.

## THIRD CLAIM FOR RELIEF – AGAINST DEFENDANT SSI

### Violation of Title VII of the Civil Rights Act of 1964 – Constructive Discharge

145.    Jessica Wahl repeats and realleges the allegations contained in paragraphs 1 through 144 above, as though repeated and set forth in full herein.

146.    Defendant SSI discriminated against Jessica Wahl because of her sex and caregiver status in violation of Title VII, 42 U.S.C § 2000e-(e)2(a), by the conduct described in this complaint (including the conduct of Producers, acting at SSI's direction and/or with SSI's knowledge, consent, and/or condonation), including by deliberately and discriminatorily creating work conditions so intolerable that any reasonable person in Jessica Wahl's position would have felt compelled to resign, as Jessica Wahl felt compelled to do, and did.

147.    As a result of SSI's discrimination, Jessica Wahl has suffered substantial damages, including but not limited to lost past and future wages and other benefits of her employment, in an amount to be proved at trial.

148.    SSI's conduct was despicable and the acts herein alleged were malicious and oppressive, and were committed with an improper and evil motive to injure Jessica Wahl, amounting to malice and in conscious disregard of Jessica Wahl's rights. Jessica Wahl is thus entitled to recover punitive damages from SSI in an amount to be proved at trial.

## FOURTH CLAIM FOR RELIEF – AGAINST ALL DEFENDANTS

### Violation of the New York State Human Rights Law, N.Y. Executive Law § 296 Unlawful Discriminatory Practices – Discrimination

149.    Jessica Wahl repeats and realleges the allegations contained in paragraphs 1 through 148 above, as though repeated and set forth in full herein.

150.    Jessica Wahl was and is a member of a group covered and protected by Section 296 of the New York State Executive Law, also known as the New York State Human Rights Law (NYSHRL).

151.    Plaintiff was an employer and an individual within the meaning of the NYSHRL.

152.    At all relevant times, Plaintiff was and is a woman, mother and a member of protected classes within the meaning of the NYSHRL.

153.    Defendant SSI was and is an employer under the meaning of the NYHRL.

154.    Defendant Sterling had the power to carry out personnel decisions and/or to do more than carry out personnel decisions made by others, including the power to hire and fire employees, including Plaintiff, sufficient to be held individually for all damages under the NYSHRL.

155.    Defendant Nylund had the power to carry out personnel decisions and/or to do more than carry out personnel decisions made by others, including the power to hire and fire employees, including Plaintiff, sufficient to be held individually for all damages under the NYSHRL.

156.    Defendants discriminated against Jessica Wahl in the terms, conditions or privileges of her employment based on her sex by the conduct described in this complaint

(including the conduct of Producers, acting at Defendants' direction and/or with Defendants' knowledge, consent, encouragement and/or condonation) in violation of the New York State Executive Law, also known as the New York State Human Rights Law.

157.    Each Defendant contributed to the discrimination, was aware of the discrimination, did nothing to resolve the discrimination and/or was complicit in the misconduct.

158.    Defendants' conduct, as alleged herein, constitutes unlawful discriminatory practices and unlawful discrimination or the basis of gender as defined by the NYSHRL, by engaging in, causing, perpetrating, committing, authorizing, directing, participating in, aiding, abetting, inciting, compelling and/or coercing the unlawful conduct alleged herein, or attempting to so, in violation of the NYSHRL.

159.    Defendants are individually and jointly liable for the unlawful conduct alleged herein, including without limitation as an "employer" under the NYSHRL and under the "aiding and abetting" provision of the NYSHRL.

160.    In taking the above described discriminatory actions, Defendants acted with malice and reckless indifference to Jessica Wahl's rights.

161.    As a result of Defendants' discriminatory acts, Jessica Wahl has suffered and will continue to suffer irreparable injury, emotional distress and other compensable damage unless and until this Court grants relief.

162.    Throughout the course of her employment with SSI, Jessica Wahl often felt ill due to stress from the hostile work environment.

163.    Due to the extreme and pervasive hostility to which she was subjected, Jessica Wahl suffered severe mental distress resulting in intense symptoms of Crohn's Disease,

painful psoriatic lesions, long stretches of sleep deprivation, depression and bouts of incontinence all of which continue to the present day.

164.    By reason of Defendants' willful and unlawful acts set forth herein, Jessica Wahl is entitled to damages in an amount equal to the salary, bonus, medical and fringe benefits she would have earned up to and including the date of normal retirement and additional expenses incurred by her by reason of Defendants' acts, in an amount to be proved at trial.

## FIFTH CLAIM FOR RELIEF – AGAINST ALL DEFENDANTS

### Violation of the New York State Human Rights Law - Retaliation

165.    Jessica Wahl repeats and realleges the allegations contained in paragraphs 1 through 164 above, as though repeated and set forth in full herein.

166.    Jessica Wahl opposed Defendants' unlawful, discriminatory employment practices and engaged in protected activity under the New York State Human Rights Law by requesting that Defendants no longer engage in such unlawful, discriminatory employment practices in her numerous requests to Human Resources, and to Defendants as herein stated.

167.    Defendants' actions  (including the conduct of Producers, acting at Defendants' direction and/or with Defendants' knowledge, consent, and/or condonation) constituted discrimination and retaliation against Jessica Wahl in violation of § 296 of the New York State Human Rights Law.

168.    As a result of Defendants' retaliation, Jessica Wahl has suffered substantial damages, including but not limited to lost wages and benefits, and emotional distress, in an amount to be proved at trial.

## SIXTH CLAIM FOR RELIEF – AGAINST ALL DEFENDANTS

### Violation of the New York State Human Rights Law – Constructive Discharge

169.     Jessica Wahl repeats and realleges the allegations contained in paragraphs 1 through 168 above, as though repeated and set forth in full herein.

170.     Defendant SSI discriminated against Jessica Wahl because of her sex in violation of § 296 of the New York State Human Rights Law by the conduct described in this complaint (including the conduct of Producers, acting at Defendants' direction and/or with Defendants' knowledge, consent, and/or condonation), including by deliberately and discriminatorily creating work conditions so intolerable that any reasonable person in Jessica Wahl's position would have felt compelled to resign, as Jessica Wahl felt compelled to do, and did.

171.     As a result of Defendants' discrimination, Jessica Wahl has suffered substantial damages, including but not limited to mental distress and lost past and future wages and other benefits of her employment, in an amount to be determined at trial.

### JURY DEMAND

Plaintiff requests a jury trial on all issues to be tried.

### DEMAND FOR JUDGMENT

**WHEREFORE**, Jessica Wahl respectfully requests a judgment against the Defendants as follows:

1.     On the First through Third Claims for Relief:

A.   That the acts, omissions, policies, practices and procedures of Defendant SSI complained of herein violated Jessica Wahl's rights under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.;

B.  That Defendant SSI make Jessica Wahl whole pursuant to Title VII of the

Civil Rights Act of 1964 by ordering Defendant SSI to pay Jessica Wahl damages,

including, *inter alia*, back pay, front pay, and other compensatory damages according to

an amount to be proven at trial;

C.  That Defendant SSI pay punitive damages in an amount appropriate to

punish it for its wrongful conduct and to set an example for others; and

D.  Ordering Defendant SSI to pay Jessica Wahl's reasonable attorney's fees

and costs, including expert witness fees pursuant to 42 U.S.C. §§ 1988 and 2000e-5(k);

2.      On the Fourth Through Sixths Claims for Relief:

A.  That the acts, policies, practices and procedures of Defendants complained

of herein violated  N.Y. Executive Law § 296, Unlawful Discriminatory Practices; and

B.  That Defendants make Jessica Wahl whole pursuant to N.Y. Executive

Law § 296, by ordering Defendants to pay Jessica Wahl damages, including *inter alia*,

back pay, front pay, and other compensatory damages according to an amount to be

proven at trial;

3.      That Jessica Wahl have such other and further relief as the Court deems just and proper.

Dated: New York, New York
       January 14, 2016

WARSHAW BURSTEIN, LLP
Attorneys for Plaintiff

By: _____
        Martin R. Lee (ML-0920)
        555 Fifth Avenue
        New York, New York 10017
        (212) 984-7700